# United States Court of Appeals
## For the First Circuit

No. 13-1310

AARON POWELL,

Petitioner, Appellant,

v.

STEVEN TOMPKINS,

SHERIFF, SUFFOLK COUNTY,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Howard and Thompson,

Circuit Judges.

K. Hayne Barnwell, by appointment of the court, for appellant.
Susanne G. Reardon, Assistant Attorney General, Criminal Bureau, Appeals Division, with whom Martha Coakley, Attorney General, was on brief for appellee.

April 15, 2015

**HOWARD, Circuit Judge**. Petitioner Aaron Powell was convicted on several state charges including unlawful possession of a loaded firearm, see Mass. Gen. Laws ch. 269, §§ 10(a), (h), (n), and his convictions were affirmed by the Massachusetts Supreme Judicial Court (SJC), see Commonwealth v. Powell, 946 N.E.2d 114 (Mass. 2011). Powell then sought federal habeas relief pursuant to 28 U.S.C. § 2254, which was denied by the district court. In this appeal from that denial, he primarily protests the state criminal procedure requirement that a defendant accused of unlawful possession of a firearm bear the burden of producing evidence of a proper license as an affirmative defense. The absence of such proffered evidence gives rise to a presumption during trial that the defendant did not have a valid license; but, if produced, the prosecution has the burden of proving beyond a reasonable doubt that the defense does not exist. See Mass. Gen. Laws ch. 278, § 7; Commonwealth v. Jones, 361 N.E.2d 1308 (1977). The SJC concluded that this state procedure comports with federal due process, and we hold that Powell has failed to establish that the state court decision conflicts with clearly established Supreme Court precedent. In addition, Powell advances Second Amendment claims, and a related Equal Protection claim. We hold that these claims also provide no basis for disturbing his state convictions. Finally, we deem waived his Sixth Amendment ineffective assistance

-2-

of counsel claim.  Accordingly, we affirm the district court's denial of his petition for § 2254 relief.

## I. Background

We are required to presume that the SJC's factual rendition is correct and, therefore, we draw our description of the facts from that opinion.  28 U.S.C. § 2254(e); see Gunter v. Maloney, 291 F.3d 74, 76 (1st Cir. 2002).

Late one night in August 2008, two Boston police officers were on routine patrol in Roxbury when they noticed a brooding crowd at an intersection.  The two dozen or so youths appeared to be aligned into three groups, with two groups on one side of the street and the third on the other side of the street.  People were yelling and pointing back and forth at one another, but the crowd grew quiet as the officers drove by in their unmarked cruiser.  One officer noticed a young man (later identified as Powell) who was walking nearby but set apart from the groups.  Powell looked away when he saw the officers and moved his hands toward his waist in a manner which the officers viewed as consistent with concealing or retrieving contraband.  Powell walked past the crowd and then began to run.

A foot chase ensued, and while en route, one officer saw Powell clutching something in his right hand.  The officer next saw the handle of a gun in Powell's hand and twice commanded Powell to drop it.  Powell continued to flee, and when attempting to climb a

fence to evade the officers, he dropped a .22 caliber revolver to the ground.  Powell then ran along the fence and into a darkened garage.  He soon emerged with both hands clenched in fists, charging at one of the officers.  The officer moved out of the way, Powell knocked into the second officer, and the foot chase continued down the street.  The police soon caught up with Powell and arrested him.  The loaded revolver was retrieved from where Powell had attempted to scale the fence.  Without first issuing Miranda warnings, an officer asked him why he ran and whether he had a license for the firearm.  Powell replied that he did not have a firearm.

The Commonwealth of Massachusetts charged Powell with several state crimes.  He waived his right to a jury trial and, after a bench proceeding, was convicted of publicly carrying a firearm without a license, Mass. Gen. Laws ch. 269, § 10(a); doing so while the firearm was loaded, id. ch. 269, § 10(n); and possessing ammunition without a permit, id. ch. 269, § 10(h).  He was sentenced to eighteen months of incarceration and three years of probation for the firearms and ammunition offenses.[1]

---

[1] Powell also was convicted for resisting arrest, which is not a part of this habeas petition.  Additionally, although it appears from the record that Powell has now completed his sentence, he filed his petition challenging the legality of his firearms convictions before his sentence concluded.  We find that his petition is neither moot nor beyond the jurisdictional reach of 28 U.S.C. § 2254(a).  See Spencer v. Kemna, 523 U.S. 1, 7-8 (1998); Carafas v. LaVallee, 391 U.S. 234, 237-38 (1968); see also Lefkowitz v. Fair, 816 F.2d 17, 19 (1st Cir. 1987).

While Powell's appeal to the state intermediate appeals court was pending, the United States Supreme Court decided McDonald v. City of Chicago, in which it held that the Second Amendment right to keep and bear arms applies to the states through the Fourteenth Amendment.  561 U.S. 742, 130 S. Ct. 3020, 3042 (2010). On its own motion, the case was transferred to the SJC, which affirmed Powell's convictions.  See Powell, 946 N.E.2d 118.

Pertinent here, the SJC rejected Powell's due process challenge to the Commonwealth's failure to present evidence that he lacked a firearms license.  Id. at 124.  Following its own precedent, the court held that the accused has the burden of producing evidence of a license as an affirmative defense in prosecutions for firearms possession and carrying offenses.  Id. It also held that this state procedure is in accord with due process because the burden of proving an element of the crime did not shift to the defendant.  Id. (relying on Jones, 361 N.E.2d 1308).

In addition, the SJC declined to assess the merits of Powell's claim that state law age restrictions on young adults' ability to obtain a license to publicly carry a firearm violate the Second Amendment and the Equal Protection Clause of the Fourteenth Amendment.  Id. at 128.  The state court viewed his age-based challenges as procedurally barred, essentially because Powell did not demonstrate that his lack of licensure was based on the minimum

-5-

age requirement alone.  Id. at 129-30.  The SJC excused Powell's failure to raise his Second Amendment arguments in a pretrial motion because the issues were not available to him until after McDonald was decided.  Id. at 127.

Lastly, the SJC rejected Powell's ineffective assistance of counsel claim, which was based on trial counsel's failure to file a motion to suppress Powell's pre-Miranda statement to the police denying that he had possessed a gun.  The court concluded that any allegedly deficient legal representation caused Powell no prejudice due to other evidence of his consciousness of guilt.  Id. at 125.

Powell later pursued a § 2254 habeas petition in federal district court, which was denied.  Powell v. Tompkins, 926 F. Supp. 2d 367 (D. Mass. 2013).  We consider the merits of the federal habeas petition de novo.  See Pena v. Dickhaut, 736 F.3d 600, 603 (1st Cir. 2013).

## II. Discussion

Securing relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") is an onerous task.  See Pub.L. No. 104-132, § 104, 110 Stat. 1214, 1218-1219, codified at 28 U.S.C. § 2254; see also White v. Woodall, 134 S. Ct. 1697, 1702 (2014); Burt v. Titlow, 134 S. Ct. 10, 15-16 (2013).  Powell may secure relief for claims addressed in his direct appeal if the state court's decision "was contrary to, or involved an

-6-

unreasonable application of, clearly established Federal law, as determined by" the Supreme Court, 28 U.S.C. § 2254(d)(1). Only legal errors that are objectively unreasonable warrant relief. See Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003) (expounding on "contrary to" prong); Titlow, 134 S. Ct. at 16 (expounding on "unreasonable application" prong); see also Woodall, 134 S. Ct. at 1702, 1706 (emphasizing that "even 'clear error' will not suffice" and rejecting an "unreasonable-refusal-to-extend rule" that was discussed in earlier AEDPA cases).

The Supreme Court's precedent, not that of the circuit courts, serves as the benchmark for securing § 2254 relief. Lopez v. Smith, 135 S. Ct. 1, 3 (2014) (per curiam); see Esparza, 540 U.S. at 16 (noting that a state court need not even be aware of Supreme Court precedents, "so long as neither the reasoning nor the result of the state-court decision contradicts them"). Here, Powell largely rests on In re Winship, 397 U.S. 358 (1970) in support of his Due Process claim, and on District of Columbia v. Heller, 554 U.S. 570 (2008) and McDonald v. City of Chicago, 561 U.S. 742 (2010) for his Second Amendment and related Equal Protection claims.

## A. Due Process

It is bedrock that the Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary

to constitute the crime with which he is charged." Winship, 397 U.S. at 364. Powell argues that under this command, "a state may not be relieved of proving beyond a reasonable doubt the elements of lack of a firearms license and registration card by imposing a so-called 'minimal' burden of production upon the defendant." Writ large, however, his claim primarily rests on the premise that absence of licensure is an element of the state criminal offense, a position that runs contrary to SJC precedent as exposited in Jones and its progeny. Undeterred, he relies on the text of the operative state statutes, select state case law, and language in his criminal complaint to support his contention that the proper due process analysis must account for absence of license as an operative element of the charged firearms crimes.

To determine the appropriate lens that governs Powell's due process claim, we begin, as we must, with Massachusetts law. See, e.g., Medina v. California, 505 U.S. 437, 445-46 (1992) (addressing state law affirmative defenses); County Court of Ulster County v. Allen, 442 U.S. 140, 156-60 (1979) (addressing state law inferences and presumptions); see also Marshall v. Bristol Superior Court, 753 F.3d 10, 19 (1st Cir. 2014) (noting that the federal court is "bound by the state court's construction of its state statutes and other issues of state law").

To lawfully possess and carry a firearm within the Commonwealth a person must either obtain a license to do so or be

-8-

exempt from the normal licensing requirements. See generally Mass. Gen. Laws ch. 140, §§ 121-131P; Hightower v. City of Boston, 693 F.3d 61, 65 (1st Cir. 2012) (surveying Massachusetts law). The categories of permits that were available at the time of Powell's arrest generally consisted of a firearms identification card (FID card), a Class B license, and a Class A license. See, e.g., Mass. Gen. Laws ch. 140, §§ 129B, 129C, 131; see also Hightower, 693 F.3d at 65; Chief of Police of City of Worcester v. Holden, 26 N.E.3d 715, 721-22 (Mass. 2015). An FID card permits a qualified person to keep a firearm and ammunition in his home or place of business but does not by itself allow an individual to carry them in public. See Mass. Gen. Laws ch. 140, §§ 129B, 129C; Hightower, 693 F.3d at 66. A Class B license generally permits a person to publicly carry smaller capacity firearms for lawful purposes. See Mass. Gen. Laws ch. 140, § 131(b). The holder of a Class A license has greater privileges and generally may publicly carry larger capacity firearms for lawful purposes that are loaded and concealed. See id. ch. 140, § 131(a); Hightower, 693 F.3d at 66. "[T]he chief of police or the board or officer having control of the police in a city or town, or persons authorized by them," serve as the state's licensing authority, Mass. Gen. Laws ch. 140, § 121, and the degree of discretion to grant a permit and to impose any restrictions on permits varies. See, e.g., Mass. Gen. Laws §§ 129B, 129C, 131; Hightower, 693 F.3d at 66 (applicant must be a "suitable person"

for a license to publicly carry); Holden, 26 N.E.3d at 723-24, 727-28 (explaining the purpose of the state's licensing prerequisites, including the "suitable person" qualification).[2]

State law also prescribes criminal penalties for certain unlawful conduct related to firearms.  Pertinent here, section 10 of Chapter 269 ("Crimes Against Public Peace") of the state's criminal code penalizes the unlawful possession or carrying of particular weapons and ammunition.  Mass. Gen. Laws ch. 269, § 10; see generally 2014 Mass. Acts ch. 284, §§ 89-92 (new legislation amending Mass. Gen. Laws ch. 269, § 10).  Criminal sanctions may be imposed on, among others:

> (a) Whoever, except as provided or exempted by statute, knowingly has in his possession . . . a firearm, loaded or unloaded, as defined in [ch. 140, § 121] without either:
>
>> (1) being present in or on his residence or place of business; or

---

[2] Comprehensive new state legislation amending a variety of firearms regulations was enacted by the Commonwealth in August 2014.  2014 Mass. Acts ch. 284 ("An Act Relative to the Reduction of Gun Violence").  Among other changes, the new law will eliminate the category of Class B license in order to create a unitary license to carry. See, e.g., id. at §§ 24, 46-48, 60, 68, 71, 101.  Our survey of Massachusetts law in this opinion generally adheres to the laws in effect at the time of Powell's criminal conduct.  Moreover, our summary is no more than that.  Chapter 140 of Massachusetts General Laws requires licensing for many activities in the Commonwealth, and the regulatory scheme for firearms within that chapter is fairly extensive, incorporating various requirements for lawful possession and carrying relating to the applicant, the setting, and the usage. See Mass. Gen. Laws ch. 140, §§ 121-131P; see also 2014 Mass. Acts ch. 284, § 70 (new legislation enacted an additional provision, Mass. Gen. Laws ch. 140, § 131Q).

-10-

> (2) having in effect a license to carry firearms issued under [ch. 140, § 131 governing licensure];
>
> . . .
>
> (h)(1) Whoever owns, possesses or transfers a firearm, rifle, shotgun or ammunition without complying with [ch. 140 § 129C governing FID cards] . . . .

Mass. Gen. Laws ch. 269, § 10. A minimum of eighteen months imprisonment is required for a section 10(a) violation, id. ch. 269, § 10(a), and enhanced punishment may be imposed for persons who violate this subsection "by means of a loaded firearm," id. § 10(n). Imprisonment is not mandatory for all section 10(h) violations. See id. § 10(h)(1).[3]

At the heart of Powell's due process claim is a statutory presumption that arises in criminal prosecution for a firearms offense.

> A defendant in a criminal prosecution, relying for his justification upon a license, appointment, admission to practice as an attorney at law, or authority, shall prove the same; and, until so proved, the presumption shall be that he is not so authorized.

Mass. Gen. Laws ch. 278, § 7 (emphasis added). Accordingly, unless an individual standing accused of unlawfully possessing a firearm

---

[3] We note that the mere failure to produce a firearms license upon demand may subject the person to surrendering the firearm, but such failure is not, standing alone, criminal. See Mass. Gen. Laws ch. 140, § 129C; see Jones, 361 N.E.2d at 1312.

-11-

produces evidence at trial demonstrating licensure, state law presumes that he is not so licensed. See Commonwealth v. Davis, 270 N.E.2d 925, 926 (Mass. 1971) (noting that the section 7 criminal procedure provision "allows the defendant to show that his conduct is within an exception to the proscription" on carrying firearms). Section 7 is a rule of state criminal procedure that applies in an array of criminal prosecutions beyond the firearms context.

Within this statutory framework, the SJC has long held that a section 10 firearms offense is a public welfare offense that imposes a general prohibition against carrying a firearm for which both exceptions and exemptions may apply in any given case. Commonwealth v. Jackson, 344 N.E.2d 166, 174 (1976); Jones, 361 N.E.2d at 1310-13; see Davis, 270 N.E.2d at 926 (explaining that section 10(a) is a regulatory measure "proscrib[ing] certain inherently dangerous acts"). In order to secure a conviction for a section 10 firearms offense, the Commonwealth must prove beyond a reasonable doubt that (1) the accused knowingly possessed a firearm, and (2) the firearm met the legal definition provided under Chapter 140, § 121. Jones, 361 N.E.2d at 1311-13; Jackson, 344 N.E.2d at 174. Pursuant to the section 7 criminal procedure provision, evidence of license may operate as an affirmative defense at a criminal trial for which the accused bears the burden of production only: "Absence of a license is not an element of the

crime as that phrase is commonly used. . . . [Rather,] the burden is on the defendant to come forward with evidence of the defense. If such evidence is presented, however, the burden is on the prosecution to persuade the trier of facts beyond a reasonable doubt that the defense does not exist."  Jones, 361 N.E.2d at 1311.[4]

In considering Powell's direct appeal, the SJC saw no reason to stray from its established state precedent, which includes the holding in Jones that the state law placing the burden of production on a defendant satisfies the baseline due process demands under Winship.  See id. at 1313.  It is this allegiance that fuels the bulk of Powell's due process claim.

Powell first argues that the very text of the statute of conviction contemplates that absence of license is an element of

---

[4] The state court has affirmed repeatedly the Jones court's exposition on both the elements of a state firearms offense and licensure operating as an affirmative defense.  See Commonwealth v. Humphries, 991 N.E.2d 652, 658-59 (2013); Commonwealth v. Eberhart, 965 N.E.2d 791, 795 (Mass. 2012); Commonwealth v. Jefferson, 965 N.E.2d 800, 809-11 (Mass. 2012); Commonwealth v. Gouse, 965 N.E.2d 774, 788 n.17 (Mass. 2012); Commonwealth v. Young, 905 N.E.2d 90, 95 n.9, 96 (Mass. 2009); Commonwealth v. Colon, 866 N.E.2d 412, 429 (Mass. 2007); Commonwealth v. Anderson, 834 N.E.2d 1159, 1173-74 (Mass. 2005); Commonwealth v. Than, 817 N.E.2d 705, 708 (Mass. 2004); Ramirez, 555 N.E.2d at 211; Commonwealth v. Tuitt, 473 N.E.2d 1103, 1109-10 (Mass. 1985).  This procedural framework with respect to license as an affirmative defense is not unusual even among federal statutes.  See, e.g., United States v. Matthews, 749 F.3d 99, 104-05 (2014) (holding that "a defendant seeking the benefit of an exception" under the pertinent statute "must shoulder the burden of coming forward with evidence regarding that exception," including a valid marijuana prescription).

the offense. He criticizes the SJC for following the "muddled rationale" of <u>Jones</u>, which he characterizes as recasting this essential element as an affirmative defense of licensure. Powell, therefore, urges us to abide by the plain language of the state statute and recognize absence of license as an operative element of the firearms charges that were levied against him. This, we cannot do.

It is, of course, the duty of the state high court to construe the meaning of state statutes, including criminal offenses and rules of procedure, and the SJC has been dogmatic in following the <u>Jones</u> exposition for more than three decades. <u>See</u> <u>Commonwealth</u> v. <u>Smith</u>, 829 N.E.2d 1090, 1092-93 (Mass. 2005); <u>Commonwealth</u> v. <u>Anderson</u>, 651 N.E.2d 1237, 1240 (Mass. App. Ct. 1995) (same); <u>see also</u> <u>Mullaney</u> v. <u>Wilbur</u>, 421 U.S. 684, 691 (1975). The SJC's exposition represents the very meaning of the statute intended by the state legislature, and we are duty bound, in no uncertain terms, to follow that state precedent. <u>See</u> <u>Mullaney</u>, 421 U.S. at 691 & n.11; <u>Marshall</u>, 753 F.3d at 19.

Still, Powell points to select state case law in order to stir up some ambiguity on the criminal elements of a section 10 firearms offense. He cites two cases in which the SJC has expressed that mere possession of a firearm is not unlawful, precedent that he sees as conflicting with the <u>Jones</u> line. <u>See</u> <u>Commonwealth</u> v. <u>White</u>, 891 N.E.2d 675 (Mass. 2008); <u>Commonwealth</u> v.

<u>Alvarado</u>, 667 N.E.2d 856 (Mass. 1996).  But, as is often the case, context clarifies.

The SJC in <u>White</u>, admittedly, painted with a broad brush when recounting the components of proof for a firearms crime.  <u>See</u> <u>White</u>, 891 N.E.2d at 678 (noting that "the Commonwealth must prove that the defendant knowingly possessed a firearm without . . . having in effect a license to carry firearms or [an FID card]").  However, its opinion otherwise shows no intent to undo clear and longstanding precedent governing the legal elements for a section 10 firearms offense and the effect of the section 7 criminal procedure provision a criminal trial.  <u>See</u> <u>id.</u>

The same is true for the Fourth Amendment discussion in <u>Alvarado</u>.  There, the SJC emphasized that mere possession of a firearm may not serve as the sole factual predicate for law enforcement's reasonable suspicion of unlawful conduct necessary to constitutionally seize and search a person or property.  <u>Alvarado</u>, 667 N.E.2d at 859-60.  This makes eminent sense given that an officer on the streets generally has no way of knowing whether a person's "mere possession" of a firearm comports with the state's regulatory requirements.  <u>See, e.g.,</u> <u>Commonwealth</u> v. <u>Couture</u>, 552 N.E.2d 538, 540 (Mass. 1990) (defendant was merely "seen in public with a handgun" and police "had no reason to believe . . . that the defendant had no license to carry a firearm"); <u>Commonwealth</u> v. <u>Toole</u>, 448 N.E.2d 1264, 1268 (Mass. 1983) (police "apparently never

-15-

asked the defendant whether he had a license to carry a firearm" but instead unlawfully searched the vehicle for one without any basis for a reasonable suspicion of unlawful possession). And, the SJC has made it clear that its Fourth Amendment decisions do not confuse or otherwise alter its Jones due process precedent. See Commonwealth v. Gouse, 965 N.E.2d 774, 803 n.17 (Mass. 2012); Couture, 552 N.E.2d at 540-41. Ultimately, in Massachusetts the presumed baseline of lawful possession afforded to an individual for Fourth Amendment purposes falls away in a criminal prosecution where a person stands at trial accused of unlawful firearms possession and makes no attempt to produce evidence of proper licensure.

Powell, therefore, does not establish any irreconcilable conflict embedded within state case law, much less one that might allow us to disregard Jones and its progeny. See Mullaney, 421 U.S. at 691 & n.11 (referencing "obvious subterfuge" as an example of "extreme circumstances" that may warrant setting aside state court exposition of state law); see also McMillan v. Pennsylvania, 477 U.S. 79, 89 n.5 (1986) (in discrediting a subterfuge-type argument, the Supreme Court "reject[ed] the view that anything in the Due Process Clause bars States from making changes in their criminal law that have the effect of making it easier for the prosecution to obtain convictions").

-16-

Powell next faults the SJC for neglecting to "analyze the effect of the indictment or complaint listing the ingredients or elements of the crime," as he purports is required by <u>Apprendi</u> and <u>Blakely</u>. See <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466 (2000); <u>Blakely</u> v. <u>Washington</u>, 542 U.S. 296 (2004). He sees the <u>Apprendi</u> and <u>Blakely</u> holdings as somehow requiring that language in a charging instrument modify the legal elements for a criminal offense prescribed under law and points to language in his criminal complaint that expressly references the absence of a license and an FID card. Neither decision, however, bears this weight. See <u>Apprendi</u>, 530 U.S. at 468-69, 477, 484-88, 490-96 (evaluating the constitutionality of a criminal procedure set forth under the state statutes, not the indictment); <u>Blakely</u>, 542 U.S. at 301, 303-04 (applying <u>Apprendi</u> rule to hold that a jury finding required for a fact that enhances a sentence beyond the statutory maximum of the standard range). Moreover, the <u>Apprendi</u> Court stressed that the <u>Winship</u> due process issue that it faced did not "raise any question concerning the State's power to manipulate the prosecutor's burden of proof by, for example, relying on a presumption rather than evidence to establish an element of an offense, or by placing the affirmative defense label on at least some elements of traditional crimes." 530 U.S. at 475 (internal citations and quotation marks omitted). Therefore, we see no error, let alone objectively

unreasonable error, in the district court's decision to omit Apprendi and Blakely from its due process analysis.

Bound as we are by state precedent on the meaning and functionality of state criminal law and procedure, the decisive § 2254 inquiry for us is this: whether the SJC's decision that the state law prescription of licensure as an affirmative defense (imposing only a burden of production, not persuasion, on a defendant) accords with procedural due process under the Federal Constitution is contrary to, or comprises an unreasonable application of, clearly established Supreme Court precedent. To this legitimate question, Powell weakly criticizes the SJC's allegiance to the due process analysis in Jones. He contends that the SJC in his direct appeal failed to account for that court's error in Jones in tying its due process analysis to the so-called "comparative convenience" test under Morrison v. California, 291 U.S. 82 (1933). We are not persuaded of any objectively unreasonable legal error.

It is true that the Jones court took its cue from Morrison, which discusses the "limits of reason and fairness" under due process for placing the burden of production on an accused in a criminal case. See Jones, 361 N.E.2d at 1311-12. The state court relied on the following guideposts as set forth in Morrison:

> The limits are in substance these, that the state shall have proved enough to make it just for the defendant to be required to repel what has been proved with excuse or explanation, or

> at least that upon a balancing of convenience or of the opportunities for knowledge the shifting of the burden will be found to be an aid to the accuser without subjecting the accused to hardship or oppression.
>
> . . .
>
> For a transfer of the burden, experience must teach that the evidence held to be inculpatory has at least a sinister effect <u>or</u> if this at times be lacking, <u>there must be in any event a manifest disparity in convenience of proof and opportunity for knowledge as, for instance, where a general prohibition is applicable to every one who is unable to bring himself within the range of an exception</u>.

Morrison, 291 U.S. at 88-89, 91 (internal quotation marks and brackets omitted) (emphasis added); see Jones, 361 N.E.2d at 1312 (quoting Morrison).  After reaffirming that the section 10 firearms offense is in the line of general prohibition crimes, the SJC then analyzed the due process question under the comparative convenience test.  Jones, 361 N.E.2d at 1312-13.

In particular, the Jones court considered the relative procedural burdens imposed by the section 7 criminal procedure provision, including that (i) various licensing authorities statewide issued and renewed licenses, (ii) an accused could produce evidence of license without testifying and with relative ease as compared to the prosecutor, and (iii) the state's statutory scheme merely required evidence of license in court rather than when first confronted by law enforcement in order to avoid criminal conviction based on "the minor mistake of leaving the license at

-19-

home."  Id.  It also considered the scant risk of erroneous conviction, remarking that: "We find it nearly impossible to believe that [the accused] had such a license but withheld it, subjecting himself to the risk of a mandatory term of imprisonment" -- "'[s]uch an absurd game does not contribute to a search for truth . . . .'"  Id. (quoting Williams v. Florida, 399 U.S. 78, 82 (1970)).  In the end, the Jones court found "no unfairness in [its] traditional rule."  Id.

Given that the section 10 firearms offense remains a general prohibition crime in the Commonwealth, it comes as no surprise to us that the SJC in Powell's direct appeal decided to abide by the due process analysis in Jones.  Cf. Morrison, 291 U.S. at 91-93 (holding that the state crime under review was not one of "general prohibition" before considering whether the evidence had any "sinister significance" in relation to the presumed culpability component).  Moreover, between the time of Jones and Powell's direct appeal, the Supreme Court's precedent has developed significantly in the field of state law affirmative defenses that fully satisfy the Winship baseline demand.  See, e.g., Gilmore v. Taylor, 508 U.S. 333, 341 (1993); Medina, 505 U.S. at 445-46; Martin v. Ohio, 480 U.S. 228, 233-35 (1987); Patterson v. New York, 432 U.S. 197, 210 (1977).  This precedent on affirmative defenses provides ready support for concluding that the SJC's due process ruling in Powell's direct appeal is not objectively unreasonable.

See Patterson, 432 U.S. at 210 (holding that due process does not create "a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused."); see also Martin, 480 U.S. at 233-35 (upholding state statute that placed on the accused the burdens of production and of persuasion beyond a reasonable doubt for self-defense as an affirmative defense). Powell neither addresses this clear Supreme Court precedent governing affirmative defenses, nor cites even a single roughly comparable federal case in which a state conviction secured under a statutory construct that is analogous to Massachusetts law was set aside as violating the Winship due process demands.[5]

Powell next faults the SJC for failing to account for the advent of the computer age under the comparative convenience test

---

[5] Powell contends that the SJC in his direct appeal ought to have followed the "rational connection" test under Tot v. United States, 319 U.S. 463 (1943) and United States v. Romano, 382 U.S. 136 (1965). However, this Supreme Court precedent is ill-fitted to the due process question for the Massachusetts firearms crime, because both cases involved state statutory schemes that relieved the prosecutor from proving an element of the crime; neither involved statutory affirmative defenses. See Tot, 319 U.S. at 464 (statute set forth that mere possession of the firearm served as presumptive proof that it was "shipped or transported in interstate or foreign commerce," an element of the offense); Romano, 382 U.S. at 137 n.2, 137-38 (statute set forth that mere unexplained presence at the site of an illegal alcohol still served as sufficient proof that the still or distilling apparatus was "in his possession or custody, or under his control," an element of the offense).

applied in <u>Jones</u>. Because nearly forty years has passed since the <u>Jones</u> decision, Powell contends that prosecutors now would no longer bear a significant burden in having to present evidence that a particular firearm is unlicensed. His understanding of the modern day burden for a prosecutor to discover licensing evidence does not square with the SJC's, however. <u>See</u> <u>Gouse</u>, 965 N.E.2d at 805-06 ("review[ing] the department's records and the police departments in any towns or cities in which the defendant may have lived" would comprise "a daunting task [where] the defendant may have assumed an alias or resided at different, or suspect locations"). Powell also ignores this state authority and otherwise fails to offer any sound basis that might compel us to disregard the SJC's own assessment on the current practical workings of the state licensing system, let alone give reason to find that the SJC's decision in the direct appeal was objectively unreasonable.

In the end, the due process question here evokes the type of constitutional standard established by the Supreme Court that permits a fair amount of latitude in the exercise of sound decisional judgment. <u>See</u> <u>Medina</u>, 505 U.S. at 445-46; <u>McMillan</u>, 477 U.S. at 91; <u>Sanna</u> v. <u>Dipaolo</u>, 265 F.3d 1, 13 (1st Cir. 2001). Even to the extent that "it is a close question whether the state decision is in error," such is not the threshold required for establishing an objectively unreasonable application of federal law

-22-

under AEDPA.  <u>Morgan</u>, 677 F.3d at 47 (internal quotation marks omitted).  Accordingly, we hold that Powell's due process claim provides no basis for granting § 2254 habeas relief.

### B. Second Amendment

Powell next seeks § 2254 habeas relief on the basis that his state firearms convictions violate his right to keep and bear arms under the Second Amendment.  He presents two claims; the first challenges the minimum age requirements for state firearms licensure (with a related equal protection claim), and the second revisits the section 7 criminal procedure provision through a different constitutional prism.  For both, Powell stands on the nascent Supreme Court precedent establishing that the Second Amendment secures a limited individual right to keep and bear arms for self-defense of hearth and home unconnected to organized militia.  <u>Heller</u>, 554 U.S. 570; <u>see</u> <u>McDonald</u>, 561 U.S. 742 (holding that the Second Amendment fully applies to state and local regulation through the Fourteenth Amendment).  We address each in turn.

### 1. Minimum Age Qualifications

A qualified applicant who is at least fifteen years of age may obtain an FID card for possession of a firearm in the home or business premises but must be at least twenty-one years of age in order to obtain a license to publicly carry a firearm.  <u>See</u> Mass. Gen. Laws ch. 140, §§ 129B(1)(v), 131(d).  Powell contends

-23-

that this age-based distinction unlawfully effects "[an] absolute prohibition of an entire class of law-abiding adults from bearing arms," namely, those who are eighteen-to-twenty years old, and, thus, runs contrary to his Second Amendment and Equal Protection rights. We, however, agree with the Commonwealth that these federal constitutional claims are barred by the procedural default rule.

A federal court generally will not review a § 2254 habeas claim when the state court's decision for that claim rests on a state law ground that is independent of the federal question and adequate to support the judgment. <u>Martinez</u> v. <u>Ryan</u>, 132 S. Ct. 1309, 1315-16 (2012); <u>see</u> <u>Hodge</u> v. <u>Mendonsa</u>, 739 F.3d 34, 44 (1st Cir. 2013). Grounded in comity and federalism, the procedural default rule bars § 2254 habeas relief "when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." <u>Coleman</u> v. <u>Thompson</u>, 501 U.S. 722, 729-30 (1991), <u>limited in part by</u> <u>Martinez</u>, 132 S. Ct. at 1319; <u>Rosenthal</u> v. <u>O'Brien</u>, 713 F.3d 676, 683 (1st Cir.), <u>cert. denied</u>, 134 S. Ct. 434 (2013).

In Massachusetts, "[o]nly one whose rights are impaired by a statute can raise the question of its constitutionality, and he can object to the statute only as applied to him." <u>Commonwealth</u> v. <u>Gordon</u>, 242 N.E.2d 399, 401 (Mass. 1968); <u>see</u> <u>Commonwealth</u> v. <u>Brunelle</u>, 277 N.E.2d 826, 830 (Mass. 1972). A criminal defendant

-24-

who is charged with violating a licensing statute may challenge the underlying state legislation "even in the absence of an application for a license," but the scope of that state judicial review has its limits. Gordon, 242 N.E.2d at 401. In such cases, the SJC restricts its attention to the particular statutory provisions that are actually implicated by the charged unlicensed activity and declines to address provisions that do not represent injury incurred by virtue of the particular conviction secured against that defendant. See id. 401-02.

Here, the SJC in Powell's direct appeal followed this state norm when declining to review the merits of Powell's age-based claims. Powell's criminal convictions rested on his conduct of publicly carrying a loaded firearm without authorization, and his lack of licensure was presumed due to his failure to produce proof on that affirmative defense. When considering Powell's argument that his firearms convictions must be reversed because the minimum age qualification was unconstitutional, the SJC immediately noted that Powell had not applied for a firearms permit and had failed to demonstrate that he would have been denied licensure based solely on his age. See Powell, 946 N.E.2d at 129-30 (citing Jackson, 344 N.E.2d at 169-70 n.3). The state court ruled, therefore, that Powell's narrow constitutional challenge to his convictions was foreclosed. See id.

-25-

In so holding, the SJC recognized that even if the age-based claims had merit, Powell's firearms convictions would remain intact given the various eligibility requirements left unchallenged that might very well operate to legitimately deny him a license, such as being a "suitable" person. See Mass. Gen. Laws ch. 140, § 131(d). In other words, the court essentially held that the purportedly unconstitutional minimum age requirement, standing alone, did not necessarily injure Powell by rendering the convictions themselves unconstitutional. We conclude that the SJC's decision declining to address the merits of the federal constitutional questions rested on an adequate and independent state law ground that bars our review of Powell's constitutional claims.

Powell seeks to excuse his state court default by relying on the futility doctrine. See Hodge, 739 F.3d at 43 (federal court may excuse state court default where a petitioner shows cause and actual prejudice). His argument is misplaced, however. Although federal courts may apply the futility doctrine in narrow circumstances for the federal exhaustion requirement, see Allen v. Attorney General of State of Me., 80 F.3d 569, 573 (1st Cir. 1996), Powell provides no authority to establish that the doctrine has any bearing on the excuse inquiry. Indeed, not one of the cases that he cites involves a § 2254 habeas petition, and our own research casts significant doubt on his presumed legal position. See

-26-

Berkley v. Quarterman, 310 F. App'x 665, 672-73 (5th Cir.), cert. denied, 558 U.S. 843 (2009) (declining to recognize a futility exception for the state procedural default rule).

Powell's cursory argument on prejudice also fails. By leaving untouched the various eligibility requirements for securing a license to publicly carry a loaded weapon, a successful constitutional challenge to the state's minimum age qualification alone does not necessarily demonstrate illegal state confinement. See 28 U.S.C. § 2254(a); Allen, 442 U.S. at 154-55 (for a § 2254 petition, "[a] party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights").[6]

Accordingly, we are foreclosed from reaching the merits of Powell's constitutional attacks on the minimum age qualification for obtaining a license to publicly carry a firearm in Massachusetts.

## 2. Criminal Procedure Provision

Powell next revisits the section 7 criminal procedure provision, arguing that the lack of license presumption infringes on his Second Amendment rights as secured under Heller and McDonald. According to Powell, these decisions "restored the

---

[6] Powell's other sundry arguments for halting the procedural default bar wholly lack merit and do not warrant extended attention.

-27-

presumption of innocence, invalidating statutes like [section 7]" that impose criminal punishment on persons "simply for exercising their Second Amendment rights."  The Commonwealth agrees that we ought to afford his claim de novo review, because the SJC's decision is silent on this constitutional claim.  See Clements v. Clarke, 592 F.3d 45, 52, 54 (1st Cir. 2010).  Even without the constraints of AEDPA, however, Powell's claim quickly crumbles.

Powell attempts to launch a Second Amendment attack on the method or legislative design by which the Commonwealth has chosen to criminally enforce its firearms licensing scheme.  He avers that the viability of his claim does not necessarily "depend upon whether the Second Amendment right extends outside the home," because he reads the Heller/McDonald decisions as affirmatively precluding states from "impos[ing] a general prohibition against carrying a firearm" and from "proscrib[ing] carrying a firearm, alone, as an inherently dangerous act [that is] subject to criminal prosecution."[7]  But, in the midst of his iterations on the holdings of Heller and McDonald, Powell underscores that he is not "challeng[ing] the licensing scheme as a whole" nor arguing that "generally requiring firearm owners to obtain licenses and

---

[7] As earlier noted, the state firearms offense is a public welfare or general prohibition offense designed "to control the carrying of firearms so as to protect the public from the potential danger incident to [their] unlawful possession."  Commonwealth v. Jefferson, 965 N.E.2d 800, 808 (Mass. 2012) (internal quotation marks and ellipses omitted); see Commonwealth v. Young, 905 N.E.2d 90, 96 (Mass. 2009); Davis, 270 N.E.2d at 926.

-28-

registration cards violates the Second Amendment." Thus, on close inspection, Powell's claim is nothing more than a hollow recapitulation of his procedural due process claim in Second Amendment garb, and its fate is the same.

Nowhere in its dual decisions did the Supreme Court impugn legislative designs that comprise so-called general prohibition or public welfare regulations aimed at addressing perceived inherent dangers and risks surrounding the public possession of loaded, operable firearms. Rather, the Court attended to legislative substance and endorsed the continuing viability of a range of state firearms regulations without endeavoring to draw Second Amendment lines for state legislative architecture. See Heller, 554 U.S. at 626-27; McDonald, 130 S. Ct. at 3047. In fact, along its sojourn, the Court recognized that states have historically executed firearms regulation through general prohibition public safety laws. See Heller, 554 U.S. at 631-32.

Powell's reliance on Herrington v. United States, 6 A.3d 1237 (D.C. 2010), also does not help him. There, the D.C. Court of Appeals reversed a defendant's conviction for unlawful possession of ammunition that rested on a general prohibition criminal statute in which the accused had the burden of proving registration as an exception or affirmative defense. 6 A.3d at 1240-47. Significant to the court, the defendant was convicted for unlawfully possessing

handgun ammunition <u>in his home</u>, and the court restricted the reach of its holding to the statute of conviction <u>as applied</u> to the defendant. <u>Id.</u> at 1242-45. It held that "the Second Amendment guarantees a right to possess ammunition in the home that is coextensive with the right to possess a usable handgun there," <u>id.</u> at 1243, and "express[ed] no opinion as to whether the [D.C.] statute is constitutional in other applications [such as when] applied to possession of handgun ammunition outside the home," <u>id.</u> at 1244, n.25. <u>Herrington</u>, therefore, has no bearing on Powell's convictions which rest on publicly carrying a loaded firearm without a license.[8]

More fundamentally, given the public sphere context for his firearm possession, Powell provides us with no basis for concluding that his convictions could even reach the safe haven of the Second Amendment. He boldly -- and wrongly -- pronounces that the Supreme Court in <u>Heller</u> "clearly established that the right to keep <u>and</u> bear arms encompasses one's 'person' unrelated to the home." (Emphasis in original.) We flatly reject his read.

---

[8] The D.C. court also included in its analysis numerous caveats beyond the home-versus-public distinction. It took note, for example, that in the District of Columbia, the relative burden of producing licensing paperwork remained in equipoise between the government and the defense. <u>Herrington</u>, 6 A.3d at 1245 n.30; <u>see</u> <u>Brown</u> v. <u>United States</u>, 66 A.2d 491, 494 (D.C. 1949) (unlike most states, only one licensing authority exists in the relatively small geographical area of the District of Columbia and that entity annually issues only a small number of licenses). This is markedly different from the burden faced by law enforcement in Massachusetts. <u>See</u> <u>Gouse</u>, 965 N.E.2d at 805-06.

Together, Heller and McDonald establish that states may not impose legislation that works a complete ban on the possession of operable handguns in the home by law-abiding, responsible citizens for use in immediate self-defense. See Heller, 554 U.S. at 628-32, 635-36; McDonald, 130 S. Ct. at 3036-46, 3050; see Hightower, 693 F.3d at 72; Booker, 644 F.3d at 22, 25 n.17. The neoteric decisions addressed only the setting of "us[ing] arms in defense of hearth and home," left open for future cases the sort of judicial review to be applied to other firearms regulation, and firmly disavowed any notion that an individual has a constitutional right "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." See Heller, 554 U.S. at 626-35; McDonald, 130 S. Ct. at 3047, 3050; see also Booker, 644 F.3d at 22.[9]

_____

[9] Several circuits have adopted a two-part framework for evaluating a claim of Second Amendment infringement in the post-Heller era. Broadly speaking, some courts first consider whether the challenged law imposes a burden on conduct that falls within the scope of the Second Amendment's guarantee as historically understood, and if so, courts next determine the appropriate form of judicial scrutiny to apply (typically, some form of either intermediate scrutiny or strict scrutiny). See, e.g., Jackson v. City and County of San Francisco, 746 F.3d 953, 962-63 (9th Cir. 2014), petition for cert. filed, (U.S. Dec. 12, 2014) (No. 14-704); Drake v. Filko, 724 F.3d 426, 429 (3d Cir. 2013), cert. denied, 134 S. Ct. 2134 (2014); Woollard v. Gallagher, 712 F.3d 865, 874-75 (4th Cir.), cert. denied, 134 S. Ct. 422 (2013); Nat'l Rifle Assn'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 194 (5th Cir. 2012), cert. denied, 134 S. Ct. 1364 (2014); United States v. Greeno, 679 F.3d 510, 518 (6th Cir.), cert. denied, 133 S. Ct. 375 (2012); Heller v. District of Columbia, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (Heller II); Ezell v. City of Chicago, 651 F.3d 684, 701-04 (7th Cir. 2011); United States v. Reese, 627 F.3d 792, 800-01 (10th Cir. 2010), cert. denied, 131 S. Ct. 2476 (2011); United States v. Marzzarella, 614

While the Supreme Court spoke of a right of law-abiding, responsible citizens to keep and bear arms "in case of confrontation" outside the context of an organized militia, Heller, 554 U.S. at 582-92; see McDonald, 130 S. Ct. at 3036-42, 3048, it did not say, and to date has not said, that publicly carrying a firearm unconnected to defense of hearth and home and unconnected to militia service is a definitive right of private citizens protected under the Second Amendment.  Debate continues among courts.  Compare Peruta v. County of San Diego, 742 F.3d 1144, 1149-66 (9th Cir. 2014), request for rehearing en banc granted, 2015 WL 1381752 (9th Cir. Mar. 26, 2015) (No. 10-56971); Drake v. Filko, 724 F.3d 426, 430-31 (3d Cir. 2013), cert. denied, 134 S. Ct. 2134 (2014); Woollard, 712 F.3d at 874-76; Moore v. Madigan,

_____

F.3d 85, 89 (3d Cir. 2010), cert. denied, 131 S. Ct. 958 (2011); cf. Kwong v. Bloomberg, 723 F.3d 160, 167 (2d Cir. 2013), cert. denied, 134 S. Ct. 2696 (2014); United States v. Bena, 664 F.3d 1180, 1182-85 (8th Cir. 2011); United States v. Skoien, 614 F.3d 638, 639-43 (7th Cir. 2010) (en banc).  See also Tyler v. Hillsdale County Sheriff's Dept., 775 F.3d 308, 318 (6th Cir. 2014) ("There may be a number of reasons to question the soundness of [the] two-step approach" adopted by various circuits.).

We thus far have entered the discourse on few occasions, mostly in direct appeals of federal firearms convictions, and have hewed closely and cautiously to Heller's circumscribed analysis and holding.  See United States v. Carter, 752 F.3d 8 (1st Cir. 2014); United States v. Armstrong, 706 F.3d 1, 3-8 (1st Cir. 2013), vacated and remanded on other grounds, 134 S. Ct. 1759 (2014) (Mem.) (citing United States v. Castleman, 134 S. Ct. 1405 (2014)); United States v. Rehlander, 666 F.3d 45, 48-50 (1st Cir. 2012); United States v. Booker, 644 F.3d 12, 15-26 (1st Cir. 2011), cert. denied, 132 S. Ct. 1538 (2012); United States v. Rene E., 583 F.3d 8, 16 (1st Cir. 2009), cert. denied, 558 U.S. 1133 (2010); cf. Hightower, 693 F.3d 61.

-32-

702 F.3d 933, 935-36 (7th Cir. 2012), with Peruta, 742 F.3d at 1179-91 (Thomas, J., dissenting); Drake, 724 F.3d at 444-46 (Hardiman, J., dissenting); Moore, 702 F.3d at 944-49 (Williams, J., dissenting); see also United States v. Masciandaro, 638 F.3d 458, 467-68, 474-76 (4th Cir. 2011).[10]

Perhaps recognizing that we would reject his argument that Heller and McDonald reach so far, Powell nevertheless invites us to hold that the limited Second Amendment right as articulated in Heller extends outside the vicinity of the home. We decline to do so.

This circuit has yet to weigh in on "the scope of the Second Amendment as to carrying firearms outside the vicinity of the home without any reference to protection of the home." Hightower, 693 F.3d at 72. Thus far, we have held that any

_____

[10] We are not sanguine about the Ninth Circuit's characterization that a "consensus" has developed among the circuits regarding some limited right under the Second Amendment to keep and bear operable firearms outside the home for the purpose of self-defense. See Peruta, 742 F.3d at 1166. True, the Seventh Circuit in Moore held as the Ninth Circuit posits, at least to a limited degree. See United States v. Williams, 731 F.3d 678, 693-94 (7th Cir. 2013) (Hamilton, J., concurring in part and in the judgment). However, the remaining three circuits identified merely assumed for analytical purposes, without deciding, that the limited Second Amendment individual right described in Heller extended somewhat beyond the hearth and home setting. See Drake, 724 F.3d at 430-31; Woollard, 712 F.3d at 874, 876; Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 89 (2d Cir. 2012); see also Hightower, 693 F.3d at 72 n.8, 74 (declining to decide public sphere question, and assuming without deciding some Second Amendment interest in publicly carrying a concealed weapon).

individual right "in carrying concealed weapons outside the home is distinct from [the] core interest emphasized in <u>Heller</u>," and that under <u>Heller</u>, "[l]icensing of the carrying of concealed weapons is presumptively lawful."  <u>See</u> <u>id.</u> at 72-74 & n.8.  Yet, Powell offers only a meager measure of briefing, about one page, to support his rather significant request.  He cites two decisions in which the Seventh and Ninth Circuits ventured into the topic of putative gun rights in the public sphere as prompted by the holistic, substantive effect of the regulations challenged before them.  <u>See</u> <u>Moore</u>, 702 F.3d 933; <u>Peruta</u>, 742 F.3d 1144.[11]  Powell's slight advocacy, however, makes his coquetry the proper candidate for appellate waiver.  <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990); <u>cf</u>. <u>Moore</u>, 702, F.3d at 935 ("The parties and the amici curiae have treated us to hundreds of pages of argument, in nine briefs" as advocacy on Second Amendment rights in the public sphere.).

---

[11] <u>See</u> <u>Peruta</u>, 742 F.3d at 1169-71 (county regulation barred a typical, law-abiding citizen fearing for his personal safety from accessing a concealed-carry license, and "open carry" was otherwise prohibited); <u>Moore</u>, 702 F.3d at 940 ("Illinois is the <u>only</u> state that maintains a flat ban on carrying ready-to-use guns outside the home . . . [n]ot even Massachusetts has so flat a ban as Illinois"); <u>see also</u> <u>Holden</u>, 26 N.E.3d at 726 (emphasizing that Massachusetts law does not absolutely prohibit handguns in the home nor ban ready-to-use firearms in public).

All told, we conclude that Powell's Second Amendment claim provides no grounding for setting aside his state firearms convictions.

## C. Sixth Amendment Right to Counsel

Powell's ineffective assistance of counsel claim relates to his trial counsel's failure to move to suppress his statement in which he denied to the arresting officer that he had possessed a firearm, without the benefit of Miranda warnings. The SJC rejected his constitutional claim on the basis that the allegedly deficient performance of counsel caused Powell no prejudice, because there was evidence that the police officers saw Powell holding a firearm and that he attempted to conceal a gun and evade the police while doing so. Powell, 946 N.E.2d at 125; see Jackson, 344 N.E.2d at 174 (prosecution must prove that the accused "knew that he was carrying a firearm" and need not prove that the accused knew he lacked a license to possess and carry a firearm).[12]

Although Powell agrees that the state court decision is reviewed under AEDPA, he fails to indicate how it is "contrary to, or involved an unreasonable application of, clearly established Federal law" as determined by the Supreme Court. 28 U.S.C.

_____

[12] The SJC decided the constitutional issue under the Massachusetts standard which generally inquires whether there has been serious deficiency of counsel and whether such substandard performance "likely deprived the defendant of an otherwise available, substantial ground of defence." Commonwealth v. Saferian, 315 N.E.2d 878, 883 (Mass. 1974). The law of our circuit is that this Massachusetts standard is the functional equivalent of the federal Strickland standard. Ouber v. Guarino, 293 F.3d 19, 32 (1st Cir. 2002).

§ 2254(d).  Indeed, he does not cite to any Supreme Court authority, such as <u>Cullen</u> v. <u>Pinholster</u>, 131 S. Ct. 1388 (2011), <u>Kimmelman</u> v. <u>Morrison</u>, 477 U.S. 365 (1986), or <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668 (1984), to grapple with the SJC's analysis at all.  See <u>Lopez</u>, 135 S. Ct. at 3 (reminding that Supreme Court precedent serves as the benchmark for securing § 2254 relief).  Accordingly, we deem his argument waived.  See <u>Glacken</u>, 585 F.3d at 552.

### III. Conclusion

Powell's petition gives no grounding for setting aside his state firearms convictions.  Accordingly, we **affirm** the district court's decision to deny his § 2254 petition.

**<u>So ordered</u>.**

**- Dissenting Opinion Follows -**

-36-

**TORRUELLA, Circuit Judge, Dissenting**.  In my view, Powell is entitled to habeas based on his due process claim.

The SJC's adjudication of that claim consisted of a reference to Commonwealth v. Jones, 361 N.E.2d 1308 (Mass. 1977) to support the proposition that, because absence of a license[13] is not "an element of the crime," id. at 1311, the burden-shifting device created by Massachusetts General Laws chapter 278, section 7 accords with due process.  Commonwealth v. Powell, 946 N.E.2d 114, 124 (Mass. 2011), cert. denied, 132 S. Ct. 1739 (2012).  The task of assessing whether this part of the SJC's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, see 28 U.S.C. § 2254(d)(1), is complicated by the fact that the precise role of licensure under the Massachusetts scheme is unsettled, notwithstanding Jones's statement.  If licensure is an affirmative defense under the Massachusetts scheme, that scheme must accord with the Supreme Court's doctrine on affirmative defenses.  On the other hand, if licensure is an element of the offense that is subject to proof by presumption under the Massachusetts scheme, that scheme must accord with the Supreme Court's doctrine on presumptions.  In my opinion, Jones and subsequent SJC cases,

---

[13] The difference between a Firearm Identification Card ("FID card") and a license is not important to my analysis, nor is the difference between possessing and carrying.  For simplicity I refer to Powell as having been charged with "possessing a firearm without a license."

including Powell's, have not spoken clearly on this point, as the district court in this case recognized.  See Powell v. Tompkins, 926 F. Supp. 2d 367, 374-75 (D. Mass. 2013).  My first task, therefore, is to determine the role of licensure under the Massachusetts scheme.

## I. Role of Licensure Under Massachusetts Scheme

I agree with the district court that the text both of Powell's criminal complaint and of the statutes under which he was charged indicates that lack of a license is an element of the offense.  The titles of the relevant counts are "Firearm <u>Without FID Card</u>, Possess" and "Firearm, Carry <u>Without License</u>." (emphasis added).  Likewise, the descriptions of the counts against Powell repeat the "without a license" phrase.  Furthermore, one of the relevant statutes provides: "Whoever . . . possesses . . . a firearm . . . <u>without complying with the [FID card] provisions</u> . . . shall be punished by imprisonment . . . ." Mass. Gen. Laws ch. 269, § 10(h)(1) (emphasis added).  The other relevant statute provides: "Whoever . . . has in his possession . . . a firearm . . . <u>without . . . having in effect a license</u> . . . shall be punished by imprisonment . . . ." Id. § 10(a) (emphasis added).

Reading the text of these counts and statutes to say that lack of a license is an element of the offense might appear inconsistent with the text of Massachusetts General Laws chapter 278, section 7, but it is not.  That section provides: "A defendant

in a criminal prosecution, relying for his justification upon a license . . . , shall prove the same; and, until so proved, the presumption shall be that he is not so authorized." Id. ch. 278, § 7. By its own terms, the requirement that a defendant prove a license applies only to "[a] defendant . . . relying for his justification upon a license." Id. (emphasis added). To rely on a license for a "justification," as that term is generally understood in criminal law, means to rely on a license for a defense. See Model Penal Code § 3.01(1) ("[J]ustification is an affirmative defense."); Black's Law Dictionary 977 (10th ed. 2014) (defining "justification" as "[a] showing, in court, of a sufficient reason why a defendant acted in a way that, in the absence of the reason, would constitute the offense with which the defendant is charged"). To say that a defendant must prove licensure in those instances when he relies on a license for his defense implies that there may be other instances in which licensure is not viewed as a defense, and in those instances the defendant may not need to prove it. Otherwise, there would have been no need for the legislature to include the limiting language. See Ropes & Gray LLP v. Jalbert, 910 N.E.2d 330, 336 (Mass. 2009) (recognizing that under Massachusetts law statutes are construed to avoid surplusage). Thus, the text of section 7, standing alone, is not probative of whether licensure is an element or a defense in the particular context of gun possession crimes.

Moreover, other cases, distinguishable from Powell's, exemplify how licensure might be raised as a defense, triggering application of section 7. Before introducing these cases, it should be noted that section 7 is a section of general applicability, appearing in the chapter governing trial procedure and proceedings before judgement. See Mass. Gen. Laws ch. 278. The section's full title is, "Burden To Prove License or Admission To Practice as Attorney at Law," and, in its entirety, it provides, "A defendant in a criminal prosecution, relying for his justification upon a license, appointment, admission to practice as an attorney at law, or authority, shall prove the same; and, until so proved, the presumption shall be that he is not so authorized." Id. § 7.

In Commonwealth v. O'Connell, the defendant was convicted of forgery. See 783 N.E.2d 417, 422 (Mass. 2003). The Massachusetts statute criminalizing forgery provides: "Whoever, with intent to injure or defraud, falsely . . . forges . . . [certain types of documents] shall be punished by imprisonment . . . ." Mass. Gen. Laws ch. 267, § 1. According to the SJC: "The elements of the crime of forgery are (1) falsely making all or part of a document or instrument; (2) with the intent to defraud." O'Connell, 783 N.E.2d at 424 n.9 (citation omitted). Despite the fact that the criminal prohibition does not mention "authority" (which, under section 7, is the equivalent of

-40-

licensure), the defendant in O'Connell tried to argue that lack of authority to create the relevant documents was an element of the crime, requiring proof by the prosecution. The SJC disagreed. See id. at 423-24. Citing section 7, the SJC said that "authority may be raised as a defense, and, if so raised, the Commonwealth then bears the burden of proving beyond a reasonable doubt the absence of authority." Id. at 424.

Similarly, in Commonwealth v. Brunelle, the defendant was convicted of performing an illegal abortion. See 277 N.E.2d 826, 828 (Mass. 1972). The relevant statute provides, "[w]hoever, with intent to procure the miscarriage of a woman, unlawfully administers to her, or advises or prescribes for her, or causes any poison, drug, medicine or other noxious thing to be taken by her . . . shall . . . be punished by imprisonment . . . ." Mass. Gen. Laws ch. 272, § 19. Notably, the statute does not say that performing any of these actions "without a license" or "without authority" constitutes the crime. As the SJC explained, citing section 7, "[i]n [a] prosecution under c. 272, s 19, [the defendant] had the burden of coming forward with evidence that he, in some circumstances, might have . . . a defence or justification for acting in apparent violation of the broad prohibition in s 19 (as, for example, showing that he had a license to practice medicine in Massachusetts) . . . ." Brunelle, 277 N.E.2d at 829.

Unlike the statutes under which Powell was convicted, the statutes at issue in O'Connell and Brunelle did not include the "without a license" language. It was thus clear in those cases, unlike in Powell's, that, were the defendant to invoke licensure, he would need to do so as a defense, triggering application of section 7.

In short, if determining the elements of the gun possession offense depended only on reading the criminal complaint and statutes, I would hold that lack of a license is an element of the crime. But I do not write on a clean slate: The SJC in Jones said that lack of a license is not an element of the offense. 361 N.E.2d at 1311. The district court here noted this Massachusetts state court interpretation, but afforded it no deference on the ground that it "def[ied] the plain reading of both the relevant firearms statutes and Powell's criminal complaint." Powell, 926 F. Supp. 2d at 375. I conclude that the SJC's statement in Jones does not preclude the determination that lack of a license is an element of the offense, but I do not adopt the district court's reasoning. A federal court on habeas review cannot ignore a high court's interpretation of its state's statutes simply because, in the federal court's opinion, that interpretation defies the statutes' plain meaning. I agree that Jones's interpretation defies the statutes' plain meaning, but that is not why I refuse to follow Jones's statement. Instead, I feel free to depart from Jones

because, as I detail below, since <u>Jones</u> was decided, the SJC has not spoken uniformly on whether the lack of a license is an element of the offense.

After <u>Jones</u> was decided, in <u>Commonwealth</u> v. <u>Toole</u>, 448 N.E.2d 1264 (Mass. 1983), the SJC was presented with the following facts: After pulling over the defendant's truck, as part of a routine frisk, a police officer found an empty holster and an ammunition clip on the defendant's person. <u>Id.</u> at 1265-66. This prompted the police to search the truck, revealing a firearm behind the seat. <u>Id.</u> at 1266. After the search, the defendant was asked if he had an FID Card, which he did not. <u>Id.</u> The SJC held that, since there was no showing that the police had any reason to believe that the defendant's possible possession of a gun was a crime -- not having asked the defendant <u>before</u> the search whether he had an FID card -- no probable cause or exigent circumstances existed to justify the warrantless search. <u>Id.</u> at 1268. Said the SJC:

> The empty holster and ammunition found on the defendant certainly created probable cause to believe that there was a gun in the cab. But carrying a .45 caliber revolver is not necessarily a crime. A possible crime was carrying a gun without a license to carry firearms. . . However, the police did not learn that the defendant had no firearm identification card until after the search.

<u>Id.</u> (citation omitted).

-43-

Because <u>Jones</u> established that lack of a license could be presumed to be an element of the offense, whereas <u>Toole</u> implied that it could not, in <u>Commonwealth</u> v. <u>Couture</u>, the Commonwealth argued that the two cases led to "an 'irrational' result, namely, that a police officer in the street must show more in determining that a gun is unlawfully carried than a prosecutor needs to prove to obtain a conviction." 552 N.E.2d 538, 540 (Mass. 1990).  The SJC attempted to reconcile the cases as in the following manner:

> <u>Jones</u> dealt with the allocation of burdens in the context of a criminal trial.  The particular burden to which . . . <u>Jones</u> pertains is not the burden of proof, but merely the burden of coming forward with evidence sufficient to raise an issue of fact. . .  Where the defendant at trial has had every opportunity to respond to the Commonwealth's charge that the defendant was unlawfully carrying a handgun, where the defendant need only produce that slip of paper indicating that he was licensed to carry that gun, and where instead the defendant produces no evidence to that effect, the jury are entitled to presume that the defendant indeed did not have a license to carry the gun, and the Commonwealth need present no additional evidence to prove that point.  This scenario is a far cry from a defendant who, having merely been seen in public with a handgun, and without any opportunity to respond as to whether he has a license, is forced out of his vehicle at gunpoint and subjected to an invasive search. . . .  The mere possession of a handgun was not sufficient to give rise to a reasonable suspicion that the defendant was illegally carrying that gun, and the stop was therefore improper under Fourth Amendment principles.

<u>Id.</u> at 540-41 (citation omitted).

After <u>Coutre</u>, in <u>Commonwealth</u> v. <u>Alvarado</u>, the SJC reiterated:

> Carrying a gun is not a crime. Carrying a firearm without a license (or other authorization) is. . . . Carrying a weapon concealed in a towel, a bag, or a knapsack, for example, . . . is not a crime in this State. The suspected crime in such circumstances can only be the carrying of an unlicensed weapon, because carrying a concealed weapon is not, standing alone, an indication that criminal conduct has occurred or is contemplated.

667 N.E.2d 856, 859 (Mass. 1996).

Then, in <u>Commonwealth</u> v. <u>Gouse</u>, 965 N.E.2d 774 (Mass. 2012), the SJC attempted to downplay the significance of decisions like <u>Couture</u> and <u>Alvarado</u>, which seemed to have called into question <u>Jones</u>'s statement that lack of a license is not an element of the offense. There, the SJC concluded that the elements of the offense are simply (1) possession of (2) a firearm, and said that statements to the contrary made in other contexts "do[] not diminish this conclusion with regard to the essential elements of the crime." <u>Id.</u> at 787 n.17. Referring to <u>Couture</u> and <u>Alvarado</u>, the SJC in <u>Gouse</u> said:

> In those cases, we concluded that the mere presence of a firearm without more did not furnish probable cause or reasonable suspicion sufficient to justify the seizure of an individual by a police officer in the field; we were not asked to examine the requirements of § 10(a) in the context of the proof necessary at a trial. There is, therefore, no meaningful conflict between the manner in which those cases, and the ones [that include

-45-

> the crime as consisting of only two elements], describe the crime of unlawful possession of a firearm. . . . Our respect for an individual's rights under the Fourth Amendment . . . against unreasonable searches and seizures on the street has no bearing on the allocation of burdens at trial.

Id. (citations omitted).

I recognize that it is the province of the states to define crimes and defenses and to allocate burdens. But from what I can tell, Massachusetts simply has not provided a clear definition of the offense of illegal firearm possession. I understand that protecting individuals' rights against unreasonable searches and allocating burdens at trial are distinct enterprises, but I do not see how this distinction permits a state court, consistent with due process, to interpret a criminal statute to have three elements in one context but to have only two elements in another. See Johnson v. Goméz, No. C 96-2913 CAL, 1997 WL 703770, at *7 (N.D. Cal. Oct. 28, 1997) (not reported), aff'd, 166 F.3d 343 (9th Cir. 1998) ("A state court's determination that a statutory provision does not characterize an element of the offense must nonetheless comport with due process." (citing McMillan v. Pennsylvania, 477 U.S. 79, 85-86 (1986)).

Here, this court is confronted with what, to my knowledge, is a novel scenario: The state legislature made lack of a license an element of the offense, whereas the state judiciary has spoken ambiguously on the matter. It should be noted that when

-46-

the Supreme Court has discussed states' authority to define crimes and to allocate burdens in the past, the discussion has often focused on the state's legislative, not judicial, branch. For instance, in McMillan v. Pennsylvania, the Supreme Court said, "in determining what facts must be proved beyond a reasonable doubt the state legislature's definition of the elements of the offense is usually dispositive: '[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged.'" McMillan, 477 U.S. at 85 (emphasis added by McMillan) (quoting Patterson v. New York, 432 U.S. 197, 210 (1977)).

I find it notable that in other states, the legislature's and the judiciary's visions on this subject accord. Indeed, in Gouse the SJC said that licensure as an affirmative defense to firearm charges "has been fully recognized in other jurisdictions." 965 N.E.2d at 788. In support of this proposition, the SJC cited cases from both Florida and Indiana. Id. An analysis of these cases proves revealing.

From Florida, the SJC cited Watt v. State, 31 So. 3d 238 (Fla. Dist. Ct. App. 2010), which itself quoted State v. Robarge, 450 So. 2d 855 (Fla. 1984). When Robarge arose in 1984, the relevant Florida statute provided, "Whoever shall carry . . . any pistol . . . without having a license . . . shall be guilty of a misdemeanor . . . ." Fla. Stat. § 790.05 (repealed 1987). In

-47-

Robarge, the State argued that licensure should be considered an affirmative defense. 450 So. 2d at 856. The Supreme Court of Florida first set out the general rule for determining whether a statutory exception is an element of an offense or a defense: "[I]f there is an exception in the enacting clause, the party pleading must show that his adversary is not within the exception; but, if there be an exception in a subsequent clause, or a subsequent statute, that is [a] matter of defence [sic], and is to be shown by the other party." Id. (quoting Baeumel v. State, 7 So. 371, 372 (1890)). Because, in the Florida statute, the phrase "without having a license" "exception" appeared in the "enacting clause," the Robarge court held that the absence of a license was an element of the crime. Id.

Subsequent to Robarge, the Florida legislature amended the statutory scheme. Today, one statutory section provides, "a person who carries a concealed weapon . . . commits a misdemeanor." Fla. Stat. § 790.01(1). In other words, the current statute outrightly bans carrying, without any mention of licensure. Another statutory subsection provides, "section [790.01] does not apply to a person licensed to carry a concealed weapon . . . pursuant to the provisions of s. 790.06." Id. § 790.01(3). In turn, independent section 790.06(1) provides, "[a]ny person in compliance with the terms of [a] license [to carry] may carry a concealed weapon or concealed firearm notwithstanding the

provisions of s. 790.01." Id. § 790.06(1) (emphasis added). These independent provisions provide the affirmative defense to the outright ban.

Watt v. State, the Florida case cited by the SJC in Gouse, arose under this new statutory scheme. 31 So. 3d 238 (Fla. Dist. Ct. App. 2010). There, the court said:

> Under the terms of the concealed weapon/firearm statute, the state does not have the burden of proving the absence of a license as an element of the crime. Rather, proof of a license is pertinent only as an affirmative defense. Generally, for a statutory exception, such as a license, to constitute a defense under Florida law, the exception "must be in a clause subsequent to the enacting clause of a statute." . . . The license defense is in the subsequent clause . . . . As such, it is an affirmative defense, not an element of the crime.

Id. at 242 (footnote omitted)(citations omitted) (quoting Robarge, 450 So. 2d at 856). As the current Massachusetts scheme is akin to the old Florida scheme -- lack of a license is mentioned in the very section that creates the criminal offense -- the SJC's reliance in Gouse on Florida cases was misplaced.

As for Indiana cases, the SJC in Gouse, 965 N.E.2d at 788, cited Taylor v. State, 578 N.E.2d 664 (Ind. 1991), which itself cited Washington v. State, 517 N.E.2d 77 (Ind. 1987). The Indiana statute at issue in both Taylor and Washington provides, "[A] person shall not carry a handgun . . . without being licensed." Ind. Code § 35-47-2-1(a). An independent section provides, "[I]t is not necessary . . . to allege the absence of a

-49-

license . . . .    The burden of proof is on the defendant to prove . . . that he has a license . . . ."   Id. § 35-47-2-24(a).

In Washington, the Supreme Court of Indiana held that lack of a license was not an element of the crime, and that possession of a license was a defense on which the defendant bore the burden of proof.   517 N.E.2d at 79.   Four years later, in Taylor, the Supreme Court of Indiana, in a three-two opinion, reiterated that possession of a license was a matter for the defendant to establish as an affirmative defense.   578 N.E.2d at 666 (citing id.).   The dissent cited the following principle of Indiana law: "When an offense is created by statute and another statute or another section of the same statute makes exceptions thereto, it is not necessary for the prosecution in the indictment or affidavit to negate the exception by stating that the defendant does not come within the same."   Id. at 667 (DeBruler, J., concurring in part and dissenting in part) (quoting Day v. State, 241 N.E.2d 357, 359 (1968)).   Because, in the Indiana statute, the "without being licensed" language is found in the enacting clause, the dissent argued that the prosecution should bear the burden of establishing that the defendant lacked a license.   Id.   It consequently called for Washington v. State to be overruled.   Id.

Several things about the Indiana scheme are notable. First, the independent proviso in the Indiana code is clearer than section 7 of chapter 278 in its intent to cast licensure as an affirmative defense.    It  pertains  only  to  gun  possession

prosecutions, appears in the same chapter as the substantive prohibition, and explicitly relieves the prosecution of alleging lack of a license. Unlike section 7, which, as discussed above, applies only _when_ licensure is raised as a defense, the Indiana proviso explicitly _makes_ licensure a defense. In addition, a majority of the Indiana Supreme Court, unlike the SJC, has spoken consistently with respect to the non-element status of licensure. Moreover, despite this clarity and consistency, the proposition that licensure is an affirmative defense garnered only a bare majority of the Indiana Supreme Court in _Taylor_, and, so far as I can tell, no federal court has been asked on habeas review to assess whether Indiana's scheme comports with due process.

Given the clear text of Powell's criminal complaint and the Massachusetts statutes, the unclear gloss on those statutes supplied by the SJC, and the comparison to other jurisdictions (invited by the SJC in _Gouse_), I conclude that in Massachusetts, a lack of a license is an element of the offense of possessing a gun without a license.

Having reached this conclusion, I must decide whether the SJC's treatment of that element in Powell's case was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. Powell would read the SJC's opinion simply to say that he bore the burden of proof on the licensure element. On that reading, the opinion would clearly be contrary to federal law. After all, it has been clear since _In_

-51-

re Winship that a state may not place on the defendant the burden of disproving an element of an offense.  397 U.S. 358, 364 (1970).

Nevertheless, the district court, in Powell, had a more charitable view of the SJC's defense of the Massachusetts scheme See 926 F. Supp. 2d at 376.  Looking past Jones's erroneous statement that licensure is not an element but an affirmative defense, the district court held Jones and section 7 to permit the lack of a license element to be presumed.  Id.  Indeed, section 7 provides that "the presumption shall be that [a defendant] is not [licensed]."  Mass. Gen. Laws ch. 278, § 7.  The defendant can rebut this presumption by adducing evidence of a license, so the presumption, in effect, shifts only the burden of production of licensure onto the defendant, leaving the burden of persuasion with the prosecution.  I now analyze de novo whether the SJC's disposition of Powell's due process claim comports with the clearly established federal law of presumptions.

**II. Analysis of SJC's Opinion Under Federal Presumption Law**

**A. SJC's Discussion of Federal Presumption Law**

In rejecting Powell's due process claim, the SJC did not cite any Supreme Court cases.  See 946 N.E.2d at 124.  Instead, it cited its previous discussion in Jones.  Id.  In Jones, and, by reference, in Powell, the SJC, in upholding the constitutionality of the Massachusetts scheme, relied on the Supreme Court cases, Mullaney v. Wilbur, 421 U.S. 684 (1975), and Morrison v. California, 291 U.S. 82 (1934).  See 361 N.E.2d at 1311-12.

-52-

Mullaney held that it violates due process for a state to require a defendant charged with murder to prove, in an attempt to reduce the charge to manslaughter, that he acted in the heat of passion on sudden provocation.  421 U.S. at 703-04.  This holding comports with Winship.  See 397 U.S. at 364.  In Jones, the SJC relied on two footnotes from Mullaney.  See 361 N.E.2d at 1311-12. In one, the Supreme Court recognized, "[m]any States do require the defendant to show that there is 'some evidence' indicating that he acted in the heat of passion before requiring the prosecution to negate this element by proving the absence of passion beyond a reasonable doubt.  Nothing in this opinion is intended to affect that requirement." 421 U.S. at 702 n.28 (citations and internal quotation marks omitted).

> In the other footnote, the Court said:
>
> Generally in a criminal case the prosecution bears both the production burden and the persuasion burden.  In some instances, however, it is aided by a presumption or a permissible inference.  These procedural devices require (in the case of a presumption) or permit (in the case of an inference) the trier of fact to conclude that the prosecution has met its burden of proof with respect to the presumed or inferred fact by having satisfactorily established other facts.  Thus, in effect they require the defendant to present some evidence contesting the otherwise presumed or inferred fact.  Since they shift the production burden to the defendant, these devices must satisfy certain due process requirements.

Id. at 702 n.31 (citations omitted).  In other words, while Mullaney prohibited a state from shifting onto the defendant the

ultimate burden of proof of an element, the SJC invoked those parts of <u>Mullaney</u> where the Court explained that its ruling would still permit a state to shift to the defendant the burden of initial production, so long as the burden of persuasion rested with the prosecution.

Of course, as reflected in the second <u>Mullaney</u> passage quoted above, the Court noted that there are due process constraints on the state's ability to shift the burden of production through use of presumption. In articulating those constraints, the SJC in <u>Jones</u> curiously looked not to the cases cited by <u>Mullaney</u>, but instead to <u>Morrison</u> v. <u>California</u>, which the SJC alleged provided "[a] classic statement" of the due process limits on shifting the burden of production. <u>Jones</u>, 361 N.E.2d at 1312. <u>Jones</u> quoted the following passage form <u>Morrison</u>:

> The limits are in substance these, that the state shall have proved enough to make it just for the defendant to be required to repel what has been rpoved [sic] with excuse or explanation, or at least that upon a balancing of convenience or of the opportunities for knowledge the shifting of the burden will be found to be an aid to the accuser without subjecting the accused to hardship or oppression.

<u>Id.</u> (correct in original) (quoting <u>Morrison</u>, 291 U.S. at 88-89). The SJC continued on to quote <u>Morrison</u>: "Such a shift [in the burden of production] may be proper if there is a 'manifest disparity in convenience of proof and opportunity for knowledge, as, for instance, where a general prohibition is applicable to

-54-

every one who is unable to bring himself within the range of an exception.'" Id. (quoting 291 U.S. at 91).

However, Jones's invocation of Morrison as the constitutional test for shifting the burden of production through presumption is problematic. The first Morrison passage quoted by the SJC pertains to the limits on shifting not the burden of production, but rather the ultimate burden of proof. See 291 U.S. at 88-89. And the second passage quoted by the SJC is incomplete. The excerpt in the SJC's opinion focuses on disparity in convenience of proof and opportunity for knowledge as justifying a shift of the production burden. In fact, Morrison said, "For a transfer of the burden, experience must teach that the evidence held to be inculpatory has at least a sinister significance, or, if this at times be lacking, there must be in any event a manifest disparity in convenience of proof and opportunity for knowledge . . . ." Id. at 90-91 (citations omitted). Jones's selective quotation overlooks the requirement that "the evidence held to be inculpatory ha[ve] at least a sinister significance." This requirement was important to the holding in Morrison. There, the defendants were convicted under a statute making it a crime to possess land if one was both a noncitizen and ineligible for citizenship. Id. at 83. The Court held unconstitutional a scheme under which the state needed to prove only possession of land, leaving proof of either citizenship or eligibility for citizenship to the defendant. Id. at 97-98. The Court explained:

> Possession of agricultural land by one not
> shown to be ineligible for citizenship is an
> act that carries with it not even a hint of
> criminality. To prove such possession without
> more is to take hardly a step forward in
> support of an indictment. No such probability
> of wrongdoing grows out of the naked fact of
> use or occupation as to awaken a belief that
> the user or occupier is guilty if he fails to
> come forward with excuse or explanation. The
> legislature may go a good way in raising (a
> presumption) or in changing the burden of
> proof, but there are limits. What is proved
> must be so related to what is inferred in the
> case of a true presumption as to be at least a
> warning signal according to the teachings of
> experience.

Id. at 90 (citations and internal quotation marks omitted). In other words, to support its holding, the Court focused less on the disparity in convenience of proof, and more on the facts that possession of land -- the evidence held to be inculpatory -- (1) lacked a sinister significance, and (2) was not related to the possessor's citizenship status.

## B. **Federal Presumption Law**

Had the SJC in Jones looked not to Morrison, but to the cases cited by Mullaney itself in support of the proposition that there are due process constraints on the state's ability to shift even the burden of production, the SJC would have had the guidance of Barnes v. United States, 412 U.S. 837 (1973) and Turner v. United States, 396 U.S. 398 (1970). See Mullaney, 421 U.S. at 702 n.31.

The Barnes Court commenced with "a review of . . . decisions[, including Turner,] which have considered the validity

-56-

under the Due Process Clause of criminal law presumptions," 412 U.S. at 841, and concluded that "[t]he teaching of the [reviewed] cases is not altogether clear," id. at 843. Some cases, like United States v. Gainey, 380 U.S. 63 (1965), applied the test first announced in Tot v. United States, 319 U.S. 463, 467 (1943) that there must be a "rational connection between the fact proved and the ultimate fact presumed."

I pause here to review the test established by Tot. There, the government urged the Court to hold that two alternative tests governed the validity of presumptions. "The first is that there be a rational connection between the facts proved and the fact presumed; the second that of comparative convenience of producing evidence of the ultimate fact." Tot, 319 U.S. at 467. But, according to Tot:

> We are of opinion that these are not independent tests but that the first is controlling and the second but a corollary. Under our decisions, a statutory presumption cannot be sustained if there be no rational connection between the fact proved and the ultimate fact presumed, if the inference of the one from proof of the other is arbitrary because of lack of connection between the two in common experience.

Id. at 467-68. Of the many cases cited in support of this statement, the most recent was Morrison v. California. See id. at 468 n.9. To reiterate, the SJC in Jones focused exclusively on what Morrison had said regarding comparative convenience of producing evidence, and ignored what Morrison had said regarding

the need for a connection between the innocuous fact proved and the culpable fact presumed. In light of <u>Tot</u>'s statement that the "comparative convenience" test is "but a corollary" of the "controlling" "rational connection" test -- a statement that, as noted above, reflects the very reasoning of <u>Morrison</u> itself -- the SJC's sole focus on comparative convenience was misguided.

Another case reviewed by <u>Barnes</u>, <u>Leary</u> v. <u>United States</u>, purported to expound on <u>Tot</u>'s "rational connection" test by saying that a "presumption must be regarded as 'irrational' or 'arbitrary,' and hence unconstitutional, unless it can at least be said with substantial assurance that the presumed fact is <u>more likely than not</u> to flow from the proved fact on which it is made to depend." 395 U.S. 6, 36 (1969) (emphasis added). In a footnote, the <u>Leary</u> Court said that, since the inference at issue failed to satisfy this "more likely than not" gloss on <u>Tot</u>'s "rational connection" test, the Court did not need to reach the question whether a presumption being used to prove an element of a crime must satisfy not only the "more likely than not" gloss, but also the "reasonable doubt" standard. <u>Id.</u> at 36 n.64. Both the final case reviewed by <u>Barnes</u>, <u>Turner</u> v. <u>United States</u>, and the <u>Barnes</u> case itself noted that <u>Leary</u> reserved the question whether the "more likely than not" or "reasonable doubt" standard controlled in criminal cases, but they too left this question open by concluding that the presumptions under review satisfied even the more

stringent "reasonable doubt" standard.  See Barnes, 412 U.S. at 845; Turner, 396 U.S. at 416.

This much is clear from the survey of these cases: if a presumption cannot satisfy Tot's "rational connection" test, it is unconstitutional; and if a presumption can satisfy the "reasonable doubt" standard, it is constitutional.  As discussed below, I conclude that the presumption at play here fails the "rational connection" test, so I need not wade into the murky water submerging presumptions that survive "rational connection" but fail "reasonable doubt."

Another principle from Barnes and Tot explains the relationship between a presumption and a de facto shift of the production burden.  The Barnes Court said:

> It is true that the practical effect of instructing the jury on [an] inference . . . is to shift the burden of going forward with evidence to the defendant. . . .  In Tot v. United States, the Court stated that the burden of going forward may not be freely shifted to the defendant.  Tot held, however, that where there is a "rational connection" between the facts proved and the fact presumed or inferred, it is permissible to shift the burden of going forward to the defendant.

Barnes, 412 U.S. at 846 n.11 (citations omitted).

Finally, after Barnes, in County Court of Ulster Cty. v. Allen, 442 U.S. 140 (1979), the Supreme Court offered another discussion of presumption law, explaining that presumptions can be permissive or mandatory.  Permissive presumptions allow, but do not require, the trier of fact to infer an "elemental fact" (i.e., the

-59-

existence of an element of the crime) from proof by the prosecution of a "basic" or "evidentiary" fact. Id. at 156-57. Because such a permissive presumption "does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted." Id. at 157. A mandatory presumption, however, "may affect not only the strength of the 'no reasonable doubt' burden but also the placement of that burden; it tells the trier that he or they must find the elemental fact upon proof of the basic fact, at least unless the defendant has come forward with some evidence to rebut the presumed connection between the two facts." Id.

The Court went on to explain that the class of mandatory presumptions can be further divided between "presumptions that merely shift the burden of production to the defendant, following the satisfaction of which the ultimate burden of persuasion returns to the prosecution; and presumptions that entirely shift the burden of proof to the defendant." Id. at n.16. With respect to mandatory presumptions that shift only the burden of production, the Court said that "[t]o the extent . . . [the] presumption imposes an extremely low burden of production -- e.g., being satisfied by 'any' evidence -- it may well be that its impact is no greater than that of a permissive inference, and it may be proper to analyze it as such." Id. To decide what type of presumption is involved in a case, said the Court, "the jury instructions will generally be

-60-

controlling, although their interpretation may require recourse to the statute involved and the cases decided under it." Id.

## C. The Presumption at Issue

I now turn to the presumption at play in Powell's case. Because Powell had a bench trial, no jury instructions were given. As a result, the district court resorted to both the text of section 7 and the surrounding caselaw. See Powell, 926 F. Supp. 2d at 376-77. The district court read section 7 -- which provides that, until licensure is proved, "the presumption shall be that [a defendant] is not [licensed]," Mass. Gen. Laws ch. 278, § 7 (West 2014) (emphasis added) -- to establish a mandatory presumption. Powell, 926 F. Supp. 2d at 377. Looking to surrounding caselaw, such as Couture, the district court determined that section 7's mandatory presumption shifted only the burden of production and not the ultimate burden of persuasion. Id. Moreover, the district court determined that "the burden of production [could] be met by a minimal showing -- that is, the mere production of a license." Id. Consequently, the court analyzed the presumption as if it was permissive, rather than mandatory. Id. I agree with this much of the district court's analysis.

At this point, I part ways with the district court. Again, the Allen Court held that permissive presumptions "affects the application of the 'beyond a reasonable doubt' standard" -- and thus raise a constitutional concern -- "only if, under the facts of the case, there is no rational way the trier could make the

-61-

connection permitted." 442 U.S. at 157. Here, the district court concluded, "[o]ne can rest assured that . . . any reasonable trier of fact could indeed ascertain a rational connection between the facts proved (the possession and carrying of a firearm) and the fact presumed (the absence of a license)." Powell, 926 F. Supp. 2d at 377. In other words, according to the district court, one's performance of conduct requiring a license rationally implies the lack of a license. With all due respect to the district court, this alleged connection is not rational. To see this error, one need only consider that the act of performing surgery does not suggest that the surgeon lacks a medical license.

The Commonwealth argues that the presumption under review makes use of a "rational connection" between the lack of a license and the defendant's failure, in the face of firearms charges, to come forward with evidence of a license, rather than the mere possession of a firearm. This purported rational connection is troubling, to say the least. Under this theory, in the face of murder charges, a defendant's failure to raise an alibi defense could give rise to the presumption that he was at the scene of the crime. To hold that lack of a license can be presumed from the defendant's failure to raise the issue at trial is to elide the distinction between an element of a crime subject to proof by presumption and an affirmative defense. The fundamental principle that one is innocent until proven guilty would be weak indeed if

one's failure to present a defense was sufficient to imply proof of guilt.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a state ruling cannot contradict clearly established federal law. 28 U.S.C. § 2254 (d)(1). If federal law is unclear, or if the state ruling is consistent with federal law, then the state wins and habeas is not granted. Id. As I am unable to perceive a reading of the SJC's disposition of Powell's due process claim that does not contradict clearly established federal law as determined by the Supreme Court, I conclude that the AEDPA standard has been met. To the extent that the SJC in Powell, through reference to Jones, elevated the "comparative convenience" test over the "rational connection" test, the adjudication was "contrary to" federal law. Further, to the extent that the SJC, again through reference to Jones, found the "rational connection" test satisfied by the presumption at issue, the adjudication involved an "unreasonable application" of federal law.

I respectfully dissent.